IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NANCY L. LOWE, | ) | CASE NO. 1:25-cv-00826-RJS |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | REUBEN J. SHEPERD |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

## I.  Introduction

Plaintiff, Nancy Lowe ("Lowe"), seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and by consent of the parties. Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards in this case, the Commissioner's final decision denying Lowe's application for DIB must be vacated and her case remanded for further consideration.

## II.  Procedural History

Lowe filed for DIB on April 27, 2022, alleging a disability onset date of September 8, 2020. (Tr. 174). Her claim was denied initially and on reconsideration. (Tr. 77-87, 89-99). She then requested a hearing before an Administrative Law Judge. (Tr. 112). Lowe (represented by counsel) and a vocational expert ("VE") testified before the ALJ on January 10, 2024. (Tr. 42-

75). On April 2, 2024, the ALJ issued a written decision finding Lowe not disabled. (Tr. 14-41). The Appeals Council denied her request for review on February 27, 2025, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; see 20 C.F.R. §§ 404.955, 404.981). Lowe timely filed this action on April 24, 2025. (ECF Doc. 1).

### III.     Evidence[1]

#### A.     Personal, Educational, and Vocational Evidence

Lowe  was 51 years old on the alleged onset date, making her an individual closely approaching advanced age, according to Agency regulations. (*See* Tr. 34). She graduated from high school. (*See id.*). In the past, she worked as a claims clerk II, registration clerk, security guard, sales clerk, cashier I, and maintenance scheduler. (*Id.*).

#### B.     Relevant Medical Evidence

On February 23, 2020, prior to her alleged onset date, Lowe met with Matthew Krohn, CNP, complaining of muscle pain and joint pain in her upper body that caused headaches. (Tr. 582). She was taking intermittent ibuprofen, Tylenol, and Flexaril without resolution. (*Id.*). She had a past positive ANA test noted in her medical history. (Tr. 583). On examination, she had decreased range of motion in her cervical spine, tenderness, pain, and spasm. (Tr. 584). CNP Krohn prescribed ibuprofen 600 mg three times daily for the next week, Zanaflex as needed for spasms, drinking more water, and to do stretching and exercises. (*Id.*).

On January 28, 2021, after the alleged onset date, Lowe met with her primary care physician, Ann Kelleher, D.O., for a comprehensive evaluation. (Tr. 419). Lowe's active

---

[1] Lowe raises issue only with the ALJ's evaluation of fibromyalgia, and of her consideration of Dr. Kelleher and PT McDonald's opinions of her physical capacity. (*See* ECF Doc. 7, pp. 1-2). I therefore provide a review of the medical record relating to Lowe's physical impairments; all other arguments are deemed waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (internal citations omitted).

problem list included cervical spondylosis without myelopathy, joint pain, chronic pain, migraines, dorsal wrist ganglion, decreased range of motion in her neck, and decreased strength of upper extremity, trunk, and back. (*Id.*). Examination results were normal. (*Id.*). Dr. Kelleher noted Lowe had hypothyroidism and had been off her medication for six months; she ordered a mammogram and thyroid stimulating hormone test. (Tr. 420).

On November 10, 2021, Lowe met with Malissa Ayers, PA-C, for follow up on her migraines. (Tr. 405). During the visit, Lowe reported increased issues with her bilateral neck, left greater than right, as well as tingling in her left shoulder and weakness in her upper left arm. (*Id.*). She described the pain as both squeezing pressure and sharp, shooting pain. (*Id.*). Naproxen and heat or biofreeze were helping somewhat. (*Id.*). She also reported a syncopal event where she was unconscious for about one minute. (*Id.*). She was taking Tizanidine to help with muscle tightness and Maxalt for migraines; she had discontinued Topamax because she didn't feel it was helping. (*Id.*). On examination, she had full range of motion, strength, sensation, and reflexes. (Tr. 407). PA Ayers assessed the neck and shoulder pain as most likely cervical radiculopathy and prescribed a Medrol dose pack, continued Tizanidine, and recommended physical therapy. (*Id.*). She recommended follow up in four to six weeks if no improvement. (*Id.*).

On November 24, 2021, Lowe presented to the emergency department complaining of a two-day headache and recent syncope episode on recommendation of PA Ayers. (Tr. 397-404). She reported that she had been having recent episodes of syncope, witnessed by her husband, with no shaking activity, chest pain, or dyspnea associated with the episodes. (Tr. 399). She also reported two to three migraines per month, as well as almost-daily posterior tension headaches. (*Id.*). CT was unremarkable and no intracranial aneurysm was not found. (Tr. 401-02). She was

determined at low risk for malignant cause of her syncope and discharged with a referral to cardiology. (Tr. 403).

On January 12, 2022,  Lowe met with Samuel W. Samuel, M.D. for pain management. (Tr. 393-95). She reported nine out of ten pain, but was more focused on her migraine pain than neck pain. (Tr. 394). She reported that she had to discontinue the Medrol prescribed by PA Ayers due to a significant migraine. (*Id.*). Dr. Samuel indicated Lowe's migraines, cervical spinal stenosis, and spondylosis were well managed by gabapentin. (Tr. 395). He prescribed gabapentin 200 mg twice daily. (*Id.*).

On April 15, 2022, Lowe presented to Matthew Krohn, APRN-CNP for follow up after an emergency department visit earlier that week. (Tr. 377). She reported vertigo, dizziness, and nausea, with earlier vomiting and diarrhea that had resolved. (*Id.*). CNP Krohn prescribed meclizine 25 mg for the vertigo, with a recommendation that if not improved, he could place a referral for vestibular therapy or neurology. (Tr. 379).

On May 19, 2022, Lowe began vestibular therapy with Mark Lundblad, PT, complaining of dizziness that interfered with her activities of daily living. (Tr. 721). She reported chronic dizziness and nausea, possibly hypothyroid; syncope, managed with hydration and compression stockings; and vertigo, most consistent with vestibular hypofunction. (*Id.*). PT Lundblad set a plan of weekly sessions for eight weeks. (*Id.*).

On June 16, 2022, Lowe attended a rheumatology consult with Kaitlyn Gasser, PA-C. (Tr. 739). PA Gasser noted a previous rheumatoid factor of 9 and cyclic citrullinated peptide of 13.5, with a prior positive ANA. (*Id.*). Lowe reported worsening neck pain since a fall in 2018, some weight gain exacerbating her joint pain, and significant finger pain. (*Id.*). She reported that all joints were affected, that they would lock up after sitting for a while, and that her toes hurt in

4

the winter. (Tr. 740). She stated that she has had joint pain since childhood, but that the pain now is worse than ever before. (*Id.*). Her hands swell in the morning, and her middle finger and thumb lock up; morning stiffness lasts 1-2 hours. (*Id.*). She reported her pain as a six out of ten in all joints. (Tr. 741). On examination, she was positive for cervical spine tenderness and paraspinal muscle tenderness/tightness, and scattered joint tenderness, with no clear synovitis or warmth to joints, but with full range of motion in all joints; there was slight triggering of right third digit, but she was able to passively extend her finger. (Tr. 746). She had tenderness in 26 tested joints. (Tr. 747). X-rays revealed no evidence of inflammatory/erosive arthropathy in the hands, feet, or knees, but mild degenerative change of the first MTP joint bilaterally, and interval progression of moderate discogenic degenerative changes at C5-6 of the cervical spine. (Tr. 763). PA Gasser assessed Lowe with pain in joints, multiple sites, elevated blood protein, and positive ANA, with a recommendation to follow up depending on the results of the labs. (Tr. 748). PA Gasser also recommended reviewing for osteoarthritis and ensure there was no evidence of inflammatory erosive diseases, particularly for her hand and foot pain. (*Id.*). Otherwise, she recommended continuing treatment with analgesics (gabapentin and Excedrin through pain management), physical therapy, and over-the-counter topicals (lidocaine patches on neck at night). (*Id.*). If those conservative measures fail, Lowe could receive injections as needed. (*Id.*).

On December 5, 2022, Lowe presented to Emily McFern, CNP, complaining of widespread joint pain, migraines, memory and focus issues, fatigue, GI issues, and depression and anxious feelings. (Tr. 1214). Lowe reported that she had attempted physical therapy but did not benefit from it; she would use an exercise bike on days she felt well, but would feel worse the next day. (*Id.*). She was on gabapentin 200 mg in the morning and afternoon and 300 mg at bedtime, Zanaflex 2 mg during the day for muscle spasms and 4 mg at bedtime as needed, and

Maxalt for migraines, with gabapentin as needed. (*Id.*). CNP McFern diagnosed Lowe with fibromyalgia and recommended following up with her primary care physician in two months. (Tr. 1215). She prescribed duloxetine 20 mg and turmeric supplements. (*Id.*).

On May 24, 2023, Lowe met with Dr. Samuel for pain management. (Tr. 847-48). Dr. Samuel noted that, as of the last visit on August 17, 2022, she was stable on gabapentin; he recommended adding CoQ10 for migraine prevention, and continuing with Maxalt and gabapentin. (Tr. 848). At this visit, Lowe complained of cramping, right shoulder, arm, and wrist pain rated as five on a ten-point scale, fatigue, widespread pain, and GI pain. (*Id.*). Lowe reported she had been diagnosed with fibromyalgia and started on Cymbalta, but she had bad side effects and she did not notice relief. (*Id.*). She was also prescribed Savella, but out-of-pocket costs were unaffordable and she was trialing Effexor instead. (*Id.*). Dr. Samuel deferred a physical examination and instead discussed her fibromyalgia etiology and treatment with antidepressants. (Tr. 850). He continued her on gabapentin and recommended follow up as needed. (*Id.*).

Lowe attended a primary care appointment with Dr. Lowe on May 26, 2023. (Tr. 843-47). Dr. Kelleher noted that Lowe was compliant with Synthroid for her hypothyroidism; that Levsin and Lomotil helped with cramping and diarrhea related to her IBS; and that she was being seen by Dr. Craciun who had started her on Effexor XR and gabapentin for her fibromyalgia. (Tr. 844). Physical examination results were normal. (Tr. 847).

Lowe met with Megan Kral, APRN-CNP for pain management on October 30, 2023. (Tr. 1117). She reported persistent pain, rated at seven on a ten-point scale. (*Id.*). She had a migraine during the visit with photophobia, nausea, and vomiting; it was her third that month and had lasted two days. (*Id.*). She had failed triptans and beta blockers, but gabapentin offered some

6

relief. (*Id.*). Examination was normal. (Tr. 1119). CNP Kral restarted Lowe on a gabapentin regimen of 200 mg twice during the day, 300 mg at bedtime, and an additional 100 mg twice daily as needed for migraines; and recommended she follow up with the headache clinic and with primary care for menopause symptoms. (Tr. 1119-20). CNP Kral also recommended thyroid stimulating hormone testing and fibromyalgia SMA. (*Id.*).

On November 1, 2023, Lowe met with neurologist A. Craciun, M.D. (Tr. 1150). Dr. Craciun noted Lowe was doing "reasonably well" on her medication regimen, and that she had considerably fewer symptoms related to her post-concussion syndrome and migraines. (*Id.*). Her sensory exam was normal and reflexes were +2 throughout; motor examination revealed full strength. (Tr. 1151). Dr. Craciun continued Lowe on Adderall, Maxalt, gabapentin, and Effexor, and recommended returning in six months for follow up. (*Id.*).

On December 12, 2023, Lowe attended a primary care visit with Dr. Kelleher. (Tr. 1217-19). Examination results were generally normal, although Lowe's blood pressure was high. (Tr. 1219). Dr. Kelleher recommended starting on lisinopril, obtaining labs, and improving diet and exercise to improve hypertension. (*Id.*). Dr. Kelleher also reviewed and PT McDonald's physical performance testing results and signed the associated form. (*Id.*).

### C.    Medical Opinion Evidence

On July 12, 2022, Lowe attended a consultative examination with Dariush Saghafi, M.D. (Tr. 796-99). She reported joint pain for over 40 years, starting in her knees and spreading to other joints; her joints are now chronically painful. (Tr. 796). She was diagnosed with osteoarthritis but also had rheumatoid markers. (*Id.*). She reported more pain in her right hand than her left. (Tr. 797). On examination, she had mild tenderness in her bilateral knees; pain with range of motion in her shoulders, right greater than left; reflexes of +2/4 globally; and peripheral

7

pulses of +2/4. (Tr. 797-98). Range of motion and strength were full bilaterally. (*Id.*). Dr. Saghafi found Lowe had chronic osteoarthritic degenerative disease, most pronounced in her right hand and upper extremity; her migraines in conjunction with her diffuse and chronic arthralgias obstruct her employability. (Tr. 798). In Dr. Saghafi's opinion, Lowe could lift, push, and pull sufficiently to perform activities of daily living; she could lift and carry up to ten pounds; she could bend, walk, and stand for up to ten minutes; she could understand the environment and her peers and communicate satisfactorily; she could travel independently. (*Id.*).

On July 18, 2022, state agency reviewing physician Leslie Green, M.D., reviewed Lowe's file at the initial level. (Tr. 77-87). Dr. Green opined that Lowe could perform light exertional work with additional limitations including no more than occasional pushing/pulling with the bilateral upper extremities; no more than occasional overhead reaching with the right upper extremity; and no driving or hazards due to dizziness, vertigo, joint pain, and possible migraine triggers. (Tr. 82-83).

Lowe attended a second consultative examination with Dr. Saghafi on March 29, 2023. (Tr. 819-21). She reported arthritis in all joints, migraines, constant vertigo and nausea, neck and shoulder pain with decreased range of motion, unexplained passing out, chronic pain, problems remembering and focusing, and hypothyroidism. (Tr. 819). On examination, she had mild discomfort in the upper and lower extremities with compression of the large muscle groups, particularly in the medial aspect of bilateral patellar regions; peripheral pulses were +2/4; had full strength in all aspects; paraspinal discomfort from the top of the thoracic to the lumbar spine without radiation; reflexes were +2/4 globally. (Tr. 820-21). Dr. Saghafi noted a recent fibromyalgia diagnosis of mild to moderate severity. (Tr. 821). In Dr. Saghafi's opinion, Lowe could lift, push, and pull sufficiently to perform activities of daily living; she could lift and carry

8

up to ten pounds for a short distance; she could bend, walk, and stand for up to 200 feet before having to stop; she could understand the environment and her peers and communicate satisfactorily; she could travel independently. (*Id.*).

On April 12, 2023, state agency reviewing physician Leon Hughes, M.D., reviewed Lowe's file at the reconsideration level. (Tr. 96-97). Dr. Hughes disagreed with the prior findings and determined Lowe could work at a medium exertional level with additional limitations including frequent balancing and climbing of ramps/stairs; no climbing of ladders/ropes/scaffolds; and occasional balancing, stooping, kneeling, crouching, and crawling due to neck pain and dizziness. (*Id.*). He also included environmental limitations including no driving or hazards due to dizziness and vertigo, joint pain, and possible migraine triggers. (Tr. 97).

On December 7, 2023, Lowe attended a functional capacity evaluation conducted by James McDonald, PT, as referred by Dr. Samuel. (Tr. 1216, 1237-1244). PT McDonald noted that Lowe put forth full effort during the exam, but that her functional pain reports were unreliable and he based functional results on her demonstrated biomechanics. (Tr. 1216, 1237). PT McDonald opined that Lowe's unskilled sedentary occupational base was significantly eroded because she was unable to sit for six hours of an eight-hour workday, or sit for at least two hours at a time. (*Id.*). Lowe was able to lift 15 pounds to below waist height and 10 pounds to shoulder height; she could carry 10 pounds; she could push 22 pounds and pull 17 pounds. (*Id.*). In PT McDonald's opinion, she could occasionally reach, pinch, grasp, squat, and climb stairs, and could occasionally perform fine and gross coordination tasks; she could frequently bend and reach; she should avoid firm grasping. (*Id.*).

On December 12, 2023, Dr. Kelleher provided a medical assessment of ability to do work-related activities. (Tr. 1245-46). She opined that Lowe could occasionally lift or carry up to 15 pounds and frequently lift or carry up to 10 pounds; she could stand for 3 hours in an 8-hour workday, and for 17 minutes without interruption; she could walk on an occasional basis; she could sit for 4.5 hours in an 8-hour workday and 1 hour without interruption; she could stoop; she had no significant manipulative limitations; and she could reach below shoulder level frequently and above shoulder level occasionally bilaterally. (*Id.*).

### D. Administrative Hearing Evidence

Lowe testified before the ALJ on January 10, 2024, along with counsel. (Tr. 47). Her counsel had submitted a brief in advance of the hearing, and highlighted to the ALJ Lowe's disabling medical conditions, including chronic migraines, post-concussion syndrome, syncope, anxiety, IBS, cervical spinal stenosis, and fibromyalgia. (*Id.*).

Lowe testified that she lived in a multi-story house with her husband, but she did not use the stairs. (Tr. 47-48). She had started gaining weight and was diagnosed with hypothyroidism, for which she takes medication. (Tr. 48). She can drive for short distances, but starts to have back, shoulder, and neck pain after 30 minutes. (Tr. 48-49). She had previously been driving up to ten hours per week for Uber, Lyft, and Uber Eats but had to stop recently due to pain. (*See id.*).

Lowe had also worked for a fleet company, but she lost that job because she was missing a lot of work and was not able to reliably start in the mornings. (Tr. 50). She had also worked as a cashier and in sales, and was required to stand for the entire shift most days in both jobs. (Tr. 50-52). She also worked in customer service positions that allowed her to sit, although she often had to stand and walk as well. (Tr. 50-53). She had also worked in security, seated, reviewing

camera footage. (Tr. 53). She is not currently looking for work, because she has attendance issues due to migraines, IBS, and pain in different areas of her body. (Tr. 54).

She testified that she takes medication for her migraines, which helps somewhat. (*Id.*). When her medication works, the migraine will last one day. (*Id.*). Otherwise, her migraines will last three or four days, and she stays in bed, throws up, and is nauseous. (*Id.*). She will get migraines four to six times per month, lasting for one day or up to a few days. (Tr. 55). Food, weather, and hormones all are migraine triggers. (*Id.*). She had had an appointment with the headache clinic for specialized care but was unable to attend the appointment due to severe symptoms. (*Id.*). Her migraines have become worse since menopause, and she cannot take hormone replacement therapy due to complications with her migraines. (Tr. 55-56).

Lowe also has widespread pain, mainly in her neck, shoulders, and back. (Tr. 56). The pain is in both shoulders, hands, and elbows, although it can come and go in all locations. (Tr. 58). It is painful for her to hold her arms out to drive, she has difficulty finding a comfortable position for sleeping because of back pain, and she often wakes up from tension headaches. (Tr. 56). She spends a lot of time managing her pain; even if she has a good day one day, she might overdo it and cause more pain over the following days. (Tr. 57). On a good day, she will help in the kitchen, but she still needs a chair available so she can rest between activities. (*Id.*). In a month, she might have a week of good days. (Tr. 57-58). If she feels well enough, she will go visit her mother, who lives six streets away. (Tr. 59). On bad days, she is fatigued and rests a lot; she does not even have the energy to shower. (Tr. 58). The most comfortable position for her is to be reclining with her feet elevated and a pillow under her knees. (Tr. 66).

She does not see a therapist, but does take Effexor for anxiety, depression, and tearfulness, prescribed by her neurologist. (Tr. 59-60). She also takes Maxalt and gabapentin for migraines. (Tr. 60).

Her IBS causes her to go to the bathroom often, five to seven times per day, and for up to twenty minutes at a time. (Tr. 63). Needing extra breaks to go to the bathroom, and missing four to seven days per month due to her other symptoms, have made it difficult for Lowe to maintain employment. (Tr. 64). One employer suggested she sign up for FMLA, but she had only worked there for six months and she was on the verge of being terminated. (Tr. 65).

Lowe has fibromyalgia flares lasting around seven days at a time. (*Id.*). She can predict the onset of a fibromyalgia flare, but not the location. (*Id.*). The pain will manifest in different ways and in different parts of her body. (*Id.*).

The VE then testified. She identified Lowe's past work as claims clerk II, DOT 205.367-018, SVP 4, semiskilled, sedentary per the DOT and as performed; registration clerk, DOT 205.367-042, SVP 3, semiskilled, and sedentary per the DOT and as performed; security guard, DOT 372.667-034, SVP 3, semi-skilled, light per the DOT, but sedentary as performed; sales clerk, DOT 279.357-054, SVP 3, semiskilled, light per the DOT and as performed; cashier I, DOT 211.362-010, SVP 5, skilled, and sedentary per the DOT and as performed; and maintenance scheduler, DOT 221.367-066, SVP 4, semiskilled, and sedentary per the DOT and as performed. (Tr. 68).

The ALJ then provided the following hypothetical: an individual of the same age, education, and past jobs as Lowe, who could work at the light exertional level, with occasional pushing and pulling with the bilateral upper extremities, never climbing ladders, ropes or scaffolds, occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching and

crawling, could perform occasional overhead reaching with the bilateral upper extremities, frequent reaching in all other directions, should avoid concentrated exposure to extreme cold, extreme heat, humidity, vibration, fumes, odors, dusts, gasses and poor ventilation, should avoid unprotected heights, commercial driving and hazardous machinery, and should avoid very loud noises. (Tr. 68-69). The VE testified that Lowe could work in Lowe's past jobs including claims clerk II, registration clerk, security guard, sales clerk, cashier I, and maintenance scheduler. (Tr. 69). The individual could also perform in three additional representative jobs, including cafeteria attendant, DOT 311.677-010, SVP 2, unskilled, 29,000 jobs in the national economy; office helper, DOT 239.567-010, SVP 2, unskilled, 101,000 jobs in the national economy; and merchandise marker, DOT 209.587-034, SVP 2, unskilled, and 147,000 jobs in the national economy. (Tr. 69-70).

The ALJ presented a second hypothetical, keeping all previous limitations but further limiting the individual to sedentary work. (Tr. 70). The VE testified that the hypothetical individual could still perform Lowe's past jobs of claims clerk II, registration clerk, security guard as performed by the claimant, and cashier II. (*Id.*).

The ALJ presented a third hypothetical, building on the first, light exertional hypothetical, but adding that the individual can understand, remember and carry out simple, routine and repetitive tasks and instructions, cannot perform work requiring a specific production rate, such as assembly line work, any production requirements allow a flexible and goal oriented pace, can maintain the focus, persistence, concentration, pace and attention to engage in such tasks, for two-hour increments, for eight-hour work days within the confines of normal work breaks and lunch periods, can deal with occasional changes in a routine work setting, and can tolerate frequent interaction with supervisors, coworkers and the general public. (Tr. 70-71). The

13

VE responded that this hypothetical would eliminate all of Lowe's past work as generally performed and as performed by the claimant. (Tr. 71). However, the representative jobs of office helper, merchandise worker, and cafeteria attendant would still be available and the number of jobs in the national economy would remain the same. (*Id.*). The VE confirmed that with the addition of those limitations, there would be no transferable skills to a sedentary exertional level. (*Id.*).

In response to counsel's question, the VE testified that if an individual could not sit for more than four and a half hours in an eight-hour workday, even sedentary work would be unavailable. (Tr. 72). However, an individual could perform jobs at the sedentary level with a sit-stand option. (*Id.*). Lowe's past work as cashier I would permit a sit-stand option. (Tr. 74). And representative jobs included circuit board assembler, DOT 726.684-110, SVP 2, unskilled, 10,000 jobs in the national economy; table worker, DOT 739.687-182, SVP 2, unskilled, 10,000 jobs in the national economy; and final assembler, DOT 713.687-018, SVP 2, unskilled, 23,000 jobs in the national economy. (Tr. 73). If the individual were further limited to occasional grasp or pinch with the bilateral upper extremities, all work would be eliminated. (*Id.*).

The VE further testified that it is work-preclusive for an individual to be off-task 15 percent or more during an eight-hour workday, excluding standard break periods. (Tr. 71). An employer may tolerate one or two absences during a 30- to 60-day probationary period, but even one absence per month on a consistent basis will result in termination. (Tr. 71-72).

## IV.     The ALJ's Decision

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2025.

2.      The claimant has not engaged in substantial gainful activity since September 8, 2020, the alleged onset date (20 CFR 404.1571 et seq.).

3.     The claimant has the following severe impairments: fibromyalgia, degenerative disc disease of the cervical spine, mild degenerative changes of the right acromioclavicular (AC) joint, and migraine headaches (20 CFR 404.1520(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except occasional pushing/pulling with the bilateral upper extremities; never climb ladders, ropes, or scaffolds; occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching, and crawling; occasional overhead reaching with the bilateral upper extremities and frequent reaching in all other directions; avoid concentrated exposure to extreme cold, extreme heat, humidity, vibration, fumes, odors, dust, gases, and poor ventilation; avoid unprotected heights, commercial driving, and hazardous machinery; and avoid very loud noises.

6.     The claimant is capable of performing past relevant work as a claims clerk II, registration clerk, security guard, sales clerk, cashier I, and maintenance scheduler. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.     The claimant has not been under a disability, as defined in the Social Security Act, from September 8, 2020, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 19-35).

## V.     Law & Analysis

### A.     Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine

whether a claimant is entitled to benefits:

1.     whether the claimant is engaged in substantial gainful activity;

2.     if not, whether the claimant has a severe impairment or combination of impairments;

3.     if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.     if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.     if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.     Standard of Review

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

**VI.    Discussion**

**A.    The ALJ erred at Step Three by failing to articulate her consideration of whether Lowe's fibromyalgia met or medically equaled a listed impairment.**

Lowe presents as her first issue before the Court that the ALJ erred at Step Three of the sequential analysis by failing to explain why her severe impairment of fibromyalgia did not meet or medically equal a listed impairment. (ECF Doc. 7, pp. 10-13). Lowe argues that Listing 14.09D may be applicable in her case; although fibromyalgia is not a listed impairment and cannot therefore meet a listing, SSR 12-2p suggests Listing 14.09D, inflammatory arthritis, may be used to determine whether fibromyalgia medically equals a listing. (ECF Doc. 7, p. 12). And,

17

as Lowe correctly notes, the ALJ's omission of any discussion of fibromyalgia in her Step Three analysis frustrates this Court's review. (*Id.* at pp. 12-13).

The Commissioner presents various arguments otherwise, but none are availing. (ECF Doc. 9, pp. 7-10). I agree with Lowe that the failure to mention fibromyalgia at Step Three despite finding it a severe impairment at Step Two provides nothing for the reviewing court to consider and requires remand.

The Commissioner's contentions that any error in not discussing a listing is harmless (ECF Doc. 9, p. 8) cuts against the established body of law, both within this Circuit and within Agency regulations. *See, e.g.*, *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011); 20 C.F.R. § 404.1520(a)(4)(iii). This Court's consideration on review is twofold: one, whether the ALJ articulated her reasoning and supported her conclusions with substantial evidence; and two, whether the ALJ made his determination according to proper legal standards. *See Napier v. Comm'r of Soc. Sec.* 127 F.4th 1000, 1004 (6th Cir. 2025). It is therefore axiomatic that the ALJ must articulate her findings. *See, e.g., Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519-20 (6th Cir. 2011). The failure to articulate in itself warrants reversal. *Reynolds*, 424 F. App'x at 416. It is not for this Court to determine whether Lowe meets or medically equals a Listing; "[a]nalysis in the first instance by the ALJ is required." *Standen v. Colvin*, No. 1:15-CV-482, 2016 WL 915254, at *4 (N.D. Ohio Mar. 7, 2016).

I first address the Commissioner's waiver argument (ECF Doc. 9, pp. 7-8). It is true that the ALJ is not required to discuss a specific listing, particularly where the claimant does not raise that listing during the hearing. *Wilson v. Comm'r of Soc. Sec.*, 618 F. App'x 281, 286 (6th Cir. 2015), citing *Malone v. Comm'r of Soc. Sec.*, 507 F. App'x 470, 472 (6th Cir. 2012). However,

the extension of this proposition does not result in a claimant waiving a Listings argument. *See id.*; *see also Biestek*, 587 U.S. at 99.

Moreover, the Commissioner's argument in this regard mistakes Lowe's argument. (*Compare* ECF Doc. 9, pp. 7-8 *with* ECF Doc. 7, pp. 10-12 *and* ECF Doc. 11, pp. 1-2). Lowe does not argue that her fibromyalgia impairment meets any listing. (ECF Doc. 7, p. 12 ("fibromyalgia is not a listed impairment and it cannot meet a listing.")). Rather, she points out that the ALJ omitted *any* Listings analysis with respect to her fibromyalgia diagnosis and points to SSR 12-2's suggestion that fibromyalgia may medically equal Listing 14.09D. (*Id.*). Thus, the central question Lowe presents is not whether fibromyalgia meets Listing 14.09D or any other listed impairment, but the ALJ's failure to follow SSR 12-2p and the omission of any discussion of fibromyalgia at Step Three. (*Id.* at pp. 11-13).

At Step Three, the ALJ must "evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds*, 424 F. App'x 411, 416 (6th Cir. 2011). However, the ALJ need not discuss a listing that the claimant clearly does not meet. *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013). Nor does the ALJ commit reversible error if the claimant does not raise a "substantial question" as to whether a listing was met – i.e., point to specific evidence that demonstrates a reasonable possibility that an impairment or combination of impairments met or medically equaled the criteria of a listing. *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432-33 (6th Cir. 2014).

But fibromyalgia is handled differently. *See* SSR. 12-2p, 2012 WL 3104689, (S.S.A. July 25, 2012). Although fibromyalgia is not a listed impairment, an ALJ must consider whether a claimant's fibromyalgia, singly or in combination with other medically determinable

19

impairments, causes functional limitations that medically equal a listed impairment. *Id.* at *6. In doing so, the ALJ is instructed to consider a wide range of medical and non-medical sources, because objective evidence is often unavailable when fibromyalgia is the underlying condition. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007); *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003) (noting that, due to the "elusive" and "mysterious" nature of fibromyalgia, medical evidence confirming the alleged severity of the impairment almost never exists). At Step Three, the regulations suggest considering fibromyalgia under Listing 14.09D, but also state that an ALJ could consider "whether it medically equals a listing in combination with at least one other medically determinable impairment." *See* SSR. 12-2p, 2012 WL 3104689, *6.

Here, at Step Two, the ALJ determined that Lowe had a severe impairment of fibromyalgia, along with degenerative disc disease of the cervical spine, mild degenerative changes of the right acromioclavicular (AC) joint, and migraine headaches. (Tr. 19). At Step Three, the ALJ determined Lowe did not meet the severity requirements for any listed impairment. (Tr. 25). At that step, the ALJ considered Lowe's physical impairments against Listing 1.15 (disorders of the skeletal spine resulting in the compromise of a nerve root) and Listing 1.18 (abnormality of a major joint in any extremity). (*Id.*). She also considered Lowe's migraine headaches against. Listing 11.02. (*Id.*). However, the ALJ omits all mention of fibromyalgia, nor does she mention SSR 12-2p at this stage. (*See id.*). I therefore cannot determine whether the ALJ considered fibromyalgia in combination with Lowe's other impairments, or whether the ALJ ignored that impairment entirely. *Standen v. Colvin*, No. 1:15-CV-482, 2016 WL 915254, at *3 (N.D. Ohio Mar. 7, 2016) (remanding for consideration of fibromyalgia under Listing 14.09D where the ALJ only considered Listings 1.02 (major

dysfunction of a joint due to any cause) and Listing 1.04 (disorders of the spine)); *Kado v. Colvin*, No. 1:15-CV-02044-DAP, 2016 WL 6067779, at *9 (N.D. Ohio Oct. 17, 2016) (reviewing the entirety of the ALJ's decision, yet remanding for failure to discuss fibromyalgia at Step Three); *Haines v. Comm'r of Soc. Sec. Admin.*, No. 5:22-CV-1161, 2023 WL 3990654, at *4 (N.D. Ohio June 14, 2023). SSR 12-2p requires that the ALJ consider the medical severity of a claimant's fibromyalgia to determine whether it medically equals a listed impairment, and articulate that consideration for subsequent review. *See also* 20 C.F.R. § 404.1520(a)(4)(iii); *Reynolds*, 424 F. App'x at 416. This, alone, requires remand.

I do not reach the ultimate question of whether or not Lowe's fibromyalgia is disabling at Step Three. Nevertheless, I determine that the Lowe has raised a "substantial question" in that regard, enough to put the ALJ on notice of the need to discuss fibromyalgia at Step Three. *Haines*, 2023 WL 3990654, at *4. The Commissioner's decision will not be upheld where the failure to follow the regulations prejudices a claimant on the merits. *Bowen*, 478 F.3d at 746. Because the ALJ did not follow the Administration's regulations and articulate any consideration of fibromyalgia at Step Three, I must remand.

Although this issue is dispositive, I respond to Lowe's next issue for completeness.

### B.  The ALJ did not err in her consideration of the medical opinion evidence.

Lowe next argues the ALJ erred in her consideration of the medical opinions given by PT McDonald and Dr. Kelleher. (ECF Doc. 7, pp. 13-19). She argues that the ALJ did not appropriately articulate her consideration of the supportability factor of these opinions by not mentioning the basis of PT McDonald's functional capacity exam or Dr. Kelleher's review of that exam. (*Id.* at pp. 17-18). Lowe further argues that, although the ALJ articulated her consideration of the consistency factor, it was not done with a full consideration of her

21

fibromyalgia diagnosis, and was therefore not supported by substantial evidence. (*Id.* at pp. 18-19).

In contrast, the Commissioner argues that substantial evidence supports the ALJ's consideration of the medical opinion evidence. (ECF Doc. 9, pp. 10-16). The Commissioner presents that, even if brief, the ALJ's discussion of PT McDonald and Dr. Kelleher's opinions met Agency regulation requirements to discuss the supportability and consistency factors. (*Id.* at pp. 10-14). The Commissioner also rejects any indirect attack Lowe might make on the prior Agency medical findings on this basis. (*Id.* at pp. 14-15). And the Commissioner states that any argument Lowe now makes regarding her symptoms amount to a reweighing of the evidence. (*Id.* at pp. 15-16). In sum, the ALJ's consideration of the opinion evidence does not rise to the level of reversible error. (*See generally id.* at pp. 10-16).

I agree with the Commissioner that the alleged error, if any, made in the ALJ's articulation of the medical opinion evidence does not require reversal.[2]

The evaluation of medical opinion evidence is governed by 20 C.F.R. § 404.1520c. This regulation mandates that the ALJ "will not defer or give any evidentiary weight, including controlling weight to any medical opinion(s) . . . ." 20 C.F.R. § 404.1520c(a). Rather, the ALJ must evaluate each medical opinion's persuasiveness based on its: (1) supportability; (2) consistency; (3) relationship with the plaintiff; (4) specialization; and, (5) "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(c); *see also Heather B. v. Comm'r of Soc. Sec.,* No. 3:20-cv-442, 2022 WL 3445856

---

[2] I disagree, however, with the Commissioner's view that remand could result in an idle formality where an ALJ indirectly attacks a medical opinion's supportability or consistency through their consideration of agency reviewing opinion evidence, (ECF Doc. 9, p. 15), or that remand of Lowe's case is otherwise useless (ECF Doc. 11, pp. 4-5). Foundationally, an ALJ's decision must be sufficiently articulated to afford meaningful review, such that both the court and the claimant may follow their logic. *See Fleischer*, 774 F. Supp. 2d at 877.

(S.D. Ohio Aug. 17, 2022). Supportability and consistency are the most important factors; ALJs must "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative findings in [their] determination or decision." 20 C.F.R. § 404.1520c(b)(2). ALJs "may, but are not required to," consider factors three through five when evaluating medical source opinions. (*Id.*).

For supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). For consistency, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and non-medical sources in the claim, the more persuasive the medical opinion(s) . . . . 20 C.F.R. § 404.1520c(c)(2).

An ALJ must "provide a coherent explanation of his [or her] reasoning. *Lester v. Saul*, No. 5:20-cv-01364, 20 WL 8093313 at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted sub nom., Lester v. Comm'r of Soc. Sec.,* No. 5:20-cv-01364. 2021 WL 119287 (N.D Ohio, Jan. 13, 2021). The ALJ's medical source opinion evaluation must contain a "minimum level of articulation" to "provide sufficient rationale for a reviewing adjudicator or court." *Revisions to Rules Regarding the Evaluation of Medical Evidence,* 2017 WL 168819, 82 Fed. Reg. 5844, 5858 (Jan. 18, 2017). If an ALJ does not "meet these minimum levels of articulation," it "frustrates this [C]ourt's ability to determine whether her disability determination was supported by substantial evidence." *Heather B.,* at *3, *citing Warren I. v. Comm'r of Soc. Sec.,* No. 5:20-cv-495, 2021 WL 860506, at *8 (N.D.N.Y., Mar. 8, 2021).

Here, the ALJ considered the relevant medical opinions as follows:

On December 7, 2023, the claimant attended a Physical Capacity Evaluation conducted by physical therapist James McDonald to determine the claimant's

tolerance to perform work tasks. Mr. McDonald spent 120 minutes with the claimant. Mr. McDonald reported the following: the claimant is unable to work full time. The unskilled sedentary occupational base is significantly eroded because she is unable to sit for approximately 6 hours of an 8-hour workday and sit at least 2 hours at one time. Mr. McDonald reported that non-material handling testing indicates the claimant demonstrates an occasional tolerance for above shoulder reach, fine coordination, gross coordination, pinching, simple grasping, squatting, and stair climbing. Mr. McDonald reported that the functional activities the claimant should avoid within a competitive work environment include firm grasping (17F/6-7, 16-25).

Although Mr. McDonald is not an acceptable "medical source" under the current SSA rules, the undersigned considered his input. In doing so, the undersigned finds his input is not persuasive. Although Mr. McDonald assessed the claimant for 120 minutes, his input is not supported by the physical examinations recounted above. Furthermore, his input is not consistent with the limited course of treatment for any medically determinable impairment.

On December 12, 2023, the claimant saw Dr. Kelleher for review of her medical problems. The claimant denied fatigue. Her medications included Adderall, Maxalt "as needed," gabapentin, Effexor, Levsin "as needed" for abdominal pain, Phenergan "as needed" for nausea/vomiting, and Tizanidine "as needed." On examination, the claimant was well appearing, alert, and in no acute distress. The physical examination was normal. Dr. Kelleher reviewed the recent physical performance testing that was done by Mr. McDonald. Dr. Kelleher completed and signed a form for the claimant (16F/2-3).

As mentioned above, on December 12, 2023, Dr. Kelleher completed a form about the claimant's physical capabilities. Dr. Kelleher expressed the following medical opinion: (1) the claimant can lift/carry 15 pounds occasionally and 10 pounds frequently, based on the physical capacity evaluation; (2) stand for 3 hours of an 8-hour workday, 17 minutes without interruption, and walking is occasional, based on the physical capacity evaluation; (3) sit for 4.5 hours of an 8- hour workday, 60 minutes without interruption, based on the physical capacity evaluation; (4) the claimant has no significant manipulative limitation of ability to work with small objects with the hands and/or use of the hands and fingers for repetitive hand-finger actions due to the impairment; and (5) frequently reach below shoulder level with the upper extremities and occasionally reach above shoulder level with the upper extremities, based on the physical capacity evaluation (18F). Dr. Kelleher's medical opinion regarding lift, carry, stand, walk, and sit is not persuasive because she based it on the physical capacity evaluation, which the undersigned finds not persuasive. Significantly, the physical examinations of the claimant by Dr. Kelleher are consistently normal (see above).

Dr. Kelleher's medical opinion that the claimant has no significant manipulative limitation of ability to work with small objects with the hands and/or use of the

hands and fingers for repetitive hand-finger actions is persuasive because it is consistent with the objective medical evidence. The physical examinations of the claimant by Dr. Kelleher show no abnormal findings of the hands or fingers. On June 16, 2022, x-rays showed no evidence of inflammatory/erosive arthropathy in the hands (4F/32-52). On March 29, 2023, Dr. Saghafi noted that the claimant's ability to grasp, manipulate, and pinch was normal, bilaterally, and her fine coordination was normal, bilaterally (see above). Dr. Kelleher's medical opinion that the claimant can frequently reach below shoulder level with the upper extremities and occasionally reach above shoulder level with the upper extremities is persuasive because on some physical examinations, decreased range of motion of the shoulders and cervical spine are noted (see above). In addition, on July 13, 2022, x-rays of the claimant's right shoulder showed "mild" degenerative changes of the acromioclavicular joint (6F/2) and on June 16, 2022, x-rays showed interval progression of "moderate" discogenic degenerative changes at C5-6 in the cervical spine but with no evidence of spondyloarthropathy (4F/32-52).

(Tr. 30-32).

Even though the ALJ made no explicit statement of the supportability factor with respect to PT McDonald or Dr. Kelleher's opinions, I do not find reversible error in her consideration. As recounted above, the regulations require the ALJ discuss the supportability factor. However, that discussion does not require a rote statement by the ALJ, contained in a single paragraph. *See Bryant v. Comm'r of Soc. Sec.*, 2019 WL 5684456, *10 (N.D. Ohio Nov. 1, 2019) ("there is no requirement that the ALJ incorporate all the information upon which she relied into a single paragraph."); *Sovey v. Kijakazi*, No. 5:20-CV-00386-MAS, 2022 WL 447052, at *4 (E.D. Ky. Feb. 9, 2022) (collecting cases regarding same). Nor are the regulations mechanically applied on review. *See, e.g., Buckhanon ex rel. J.H. v. Astrue*, 368 F.App'x 674, 678-79 (7th Cir. 2010) (describing that courts consider ALJ decisions as a whole and with common sense). Rather, all that is required is for the ALJ to "discuss significant evidence supporting her decision and explain her conclusions with sufficient detail to permit meaningful review[.]" *Bryant*, 2019 WL 5684456 at *10.

Having read the ALJ's discussion of the opinion evidence in this manner, I am able to trace the path of her reasoning. *See Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011). Although it may be true that the supportability factor is given short shrift in her discussion of the matter, the discussion is still there, and can be followed. Supportability considers the comparison of the medical provider's opinion against their own treatment notes and related records. *See* 20 C.F.R. § 404.1520c(c)(1). "In other words, 'supportability' is the extent to which a medical source's *own* objective findings and supporting explanations substantiate or support the findings in the opinion." *Murray v. Bisignano*, No. 5:24CV00639, 2025 WL 2249590, at *8 (N.D. Ohio Aug. 7, 2025) (emphasis in original). In her decision, the ALJ considered both PT McDonald and Dr. Kelleher's opinions in light of the supportability of their own records. (Tr. 30-31, discussing the Physical Capacity Evaluation testing underlying PT McDonald's opinion, *and* Tr. 31-32, discussing Dr. Kelleher's physical examination notes from Lowe's treatment with her.). Thus, I find no reversible error in the ALJ's consideration of the supportability factor.

And, to the extent that Lowe argues the ALJ improperly discussed "supportability" in terms of the opinions' "consistency" with the rest of the record (*see* ECF Doc. 7, p. 17, citing to Tr. 31), I likewise find no reversible error. "[E]ven where an ALJ appears to conflate the terms "supportability" and "consistency," courts have found no error where the court is able to follow the ALJ's reasoning and is satisfied that the ALJ properly performed the requisite analysis of these factors." *Murray*, 2025 WL 2249590, at *10. As above, I am satisfied that the ALJ fully considered the record and described her consideration in a way that can be followed on review. Lowe has not shown reversible error as to the supportability factor.

Neither has Lowe shown error as to the consistency factor. Lowe acknowledges that the ALJ describes her consideration of Dr. Kelleher and PT McDonald's opinions in terms of their consistency with the rest of the medical record. (*See* ECF Doc. 7, p. 18). Nevertheless, Lowe still argues that the ALJ should have found her providers more persuasive because she believes that the ALJ did not give enough credence to her fibromyalgia diagnosis. (*Id.* at pp. 18-19). This disagreement with the ALJ's handling of the evidence does not amount to error. Instead, it asks this Court to step into the shoes of the ALJ and reconsider the evidence in her favor, which it may not do. My review of the ALJ's decision, as quoted in detail above, reveals that the ALJ properly articulated the consistency factor. (*See* Tr. 30-32). As provided in the medical evidence section, it does not appear that the ALJ failed to consider evidence, nor does it appear that she materially misstated any evidence that would undermine her decision. Furthermore, any disagreement Lowe may have with the ALJ's assessment of her fibromyalgia is resolved by the remand of the Step Three issue above, and better addressed at that stage rather than by this Court's review of the opinion evidence. I therefore decline to follow Lowe's request to re-decide the evidence in a manner more favorable to her fibromyalgia diagnosis.

With this, I affirm the Commissioner's decision as to Issue Two.

**VII.    Conclusion**

Because the ALJ failed to apply proper legal standards, I determine that the Commissioner's final decision denying Lowe's application for DIB be vacated and that Lowe's case be remanded for further consideration consistent with this opinion.


Dated: November 17, 2025

Reuben J. Sheperd
United States Magistrate Judge